Your Honor, this is the fourth case in the morning, call 211-0705, J. Lyle Clark v. Community Unit School District 303 on behalf of the Appalachians, Mr. Timothy Dwyer, on behalf of the Appalachians, Mr. Robert Swain. Alright, are both sides ready to proceed? Yes, Your Honor. Mr. Dwyer, then you may proceed. Thank you, Madam Justice, Justice McClaren, Justice Stock. My name is Eric Searing, this is Mr. Swain. Timothy Dwyer on behalf of J. Lyle Clark and additional plaintiffs who challenged the implementation of a disputed plan from School District 303. If I may, and I apologize, this is the last time I'll read from any portion of the briefs today, but in the statement of fact section that the defendant felt compelled to file, it is stated from the 2005-2006 school year to the 2009-10 school year, Davis School made AYP each year and its test scores indicated consistently high-performing school. During the same period, however, Davis was also significantly overcrowded. Its enrollment reached a peak in the 2009-10 school year at 584 students. This was due in part to some Richmond students opting to attend Davis School through choice in the 2008-09 and 2009-10 school years, but most referring to the overcrowding. It was due to the high birth rates and, as a result, student population growth in the Davis planning attendance area. I submit to the court that in the context of the plan that the school district provided in this case, you will find nothing at all like that in terms of any references to what are we going to do about the Davis School overcrowding. Quite frankly, it did not exist. It never existed until December of 2010 or January of 2011 when the school district had to come up with a plan to deal with the Richmond family scores under Title 23 of the Illinois Code. And what happened then is that the district looked at the situation and said, well, we're going to comport with the regulations and go through this incredibly tiresome and burdensome process, or we can reinvent ourselves, call ourselves two new schools, and start all over again. No problem. We don't loan or have any failing schools if we have two new schools. And our position, if you look at the Second Amendment complaint or the original complaint, we got mired for a little while in federal court over some jurisdictional issues. But attached to both of those complaints are the exhibits that the school district produced in late 2010 and early 2011. And those start and end with failing AYP scores at Richmond School, the subsequent notification of parents, the resulting departure of at least 117 students, and then the plan. And now when you read their briefs before this court, before the trial court, they're saying, well, we're just dealing with a future educational plan pursuant to our discretionary powers under the general provisions of the school code. Assuming that that might be true, our position is that the plaintiffs had the ability, indeed the chance, to adjudicate those issues before the trial court. When you look at the trial court's comments pursuant to the motion for judgment on the pleadings, you'll find that, at least on two separate occasions, the trial court characterized the, I don't want to say overcrowding at Davis, I want to characterize the situation as a legal coincidence. That it was just coincidence that this one school right next door was having many, many more students come to their school when the school next door had, by virtue of the law, had to give notification to the parents saying, you know, this particular school is failing, you have the choice to take your students elsewhere in the district. And that occurred. I don't know how the trial court can be so knowledgeable as to look at the pleadings where we say, pursuant to the school district's own documents, here's what happened. And then the school district says, well, no, no, no, that's not what happened. This is a separate and distinct plan that has nothing to do with this. And then the trial court says, well, this is a legal coincidence. The shift in population. What did the trial court mean by that term, legal coincidence? Your Honor, that's an excellent question, and I can't answer that. All I know is he said it twice. Maybe we can compare it to an illegal coincidence. Okay. It's not an illegal coincidence. Perhaps. And I think that, Your Honor, that there's a very real chance that it might not be an illegal coincidence or a legal coincidence. But the question is, are the plaintiffs precluded from adjudicating whether or not it is? Well, what the trial court did when it said this was a legal coincidence, is that a legal conclusion or a legal determination of mixed questions of law and fact? I think it is a legal determination of the dispositive issues in this case. And I submit to you, Your Honor, that the trial court could not make that legal conclusion based upon the pleadings alone. There were numerous material issues. How could it have made that legal determination? Only by considering what was taught. Material? A hearing? I don't know. Depositions? At least some more evidence, Your Honor. There are allegations that but for the failing AYP enrichment and the subsequent notification and departure of about 25 percent of that population, that this particular plan would have never come into fruition. And I think the trial court said, you know, as a matter of law or a matter of mixed question of law and fact, that's not true. And I submit to this court that the trial court did not have enough evidence to make that determination. Why did you file a petition for re-assertion? Your Honor, because there's a possibility that there was no implied right of review on behalf of the individual plaintiffs. The statute is silent. The regulatory scenario does not direct you any which way. It's not like a Clean Water Act situation where there's a citizen's lawsuit. And at the same time, I would submit to the court that the statute in conjunction with the regulatory scenario is not clear as to who, if anyone, reviews this stuff. If you look at the defendant's brief, they'll tell you that we should assume the ISBA. ISBE. ISBE. Thank you. Right, right. I think I just paid my dues, Your Honor. And it's stuck in my head. You can always sue the ISBA. General principle. Why can't you go that route and don't have an alternative route if you, in fact, don't have a private right? Your Honor, in the record at the time of the lawsuit, there was no evidence whatsoever that the plan had been tendered to the ISBE or that the ISBE had taken any formal or informal action with regard to that plan. Curiously, when we brought that up in our response to their motion for judgment on the pleadings, a day later, they moved to supplement. And I think that you'll find it in the record, but it's not part of the official record, because we moved to strike and that motion to strike was granted. They had a letter from the ISBE, I believe General Counsel, saying that what they had done was appropriate. Now, that letter was devoid of what process, if any, was followed, who made the decision, whether or not it was appropriate, under what methodology or criteria that determination was made. It's just that, hey, they're doing a great job. This is appropriate. The plans are wrong. And the trial court did strike that letter. But aside from that, within the record, Your Honor, I don't think that you can find any action informal or formal from the ISBE with respect to this issue. Isn't there a subtle difference between saying that you left standing and there is no private right of action? Yes, there is. But I think the larger question, Justice McClaren, is that if the parents of the students of the district left standing to ensure that the district follows the law, then there's absolutely nothing to preclude any school district throughout the state from reinventing themselves and totally evading or circumventing the extensive regulatory mandates that have, for good or bad, been adopted identical in substance pursuant to the federal program. I'm not making any recommendation as to whether or not that policy is good. But it certainly exists. And the funding is contingent upon that. And what happened now in this particular situation is that in those regulations, it contemplates what will happen if a new school is put online. It doesn't contemplate what will happen if, pursuant to family scores, a district decides to combine schools, call them new schools, and proceed from there. It's actually, when you think about it, it's a disingenuous methodology of circumventing the regulations. Because once you have a new school, it's like what happened in the past just doesn't exist. It would be like if I had a man... Would that be a legal or an illegal coincidence? I don't think it would be a coincidence, Your Honor. I don't think at any point in time, right now, that we can call it a coincidence. Whether or not it's legal or illegal needs to be adjudicated. I'm sorry. I was just going to say, some of the issues that you're raising, are those something that perhaps would be better addressed by the legislature? Could you give me an example of what might be better addressed by the legislature, Your Honor? Some of the loopholes that you perceive with respect to some of these school districts. Could the regulations be tighter? Yes. Absolutely. Yes, they could. But in the context of a legal issue for reviewing what a body of the government does, in the event that there is no complete bar from review, I think that we are entitled to a written certiorari to see whether or not the district acted in a legal manner. That was, Your Honor, we were pleading in the alternative. Obviously, if the court finds that as a taxpayer and a parent of the student for which the regulations are geared towards, we don't have standing, then the written certiorari was an alternative plea to review what had happened here. Because this is a little bit interesting in that what you're talking about is reviewing the policy of a local unit of government. And quite clearly, when you read part of their brief, the defendant is saying, listen, we are a local unit of government. We have local problems. Am I out of time? Not yet. Sorry. We have these local problems, and we need to address those on a local level. And we can't have, you know, disenfranchised or dissatisfied parents coming in and saying, you know, we don't like this. We want to impose our view upon you, school board. That's not what's happening here. Not even close. And on the other hand, what they're saying is that, with respect to another comment, you know, plaintiffs have it wrong. You have to sue the ISBE. So it's a statewide issue. And I'm curious, in the conversation today before the court, as to which one is it? Is it a local issue, or is it a state issue? Perhaps it's both. And I miss the comparative, the catch-all that brings it together. I think that was my point. If you have tighter state regulation, then perhaps the local shall follow, or must follow. That's true, Your Honor. But right now I don't have that. And right now what I have is what a school district did is basically reinvent themselves like a private entity cannot do. If I was a manufacturing plant on the Fox River, and I have an NPDES permit for like an ammonia discharge, and I come in and I buy the manufacturing thing, and now I'm a new owner. So I say to the EPA, well, you know what? With those violations in the past, those don't matter. I'm a new owner. I'm starting fresh. I got a brand-new name. I got a brand-new NPDES permit, and those violations in the past don't matter. Well, the EPA is not going to buy that argument because I've been discharging that ammonia in the past. And what happened here is that over time, you know, we had a problem at Richmond School. And instead of fixing it, we just combined some schools and basically evaded those mandates which say, once this problem exists, you have to do A through Z. Well, no, I don't. All I have to do is B, is combine the schools, call them new, and there I go. Right, right. Problem solved. Counselor, your time is up, but you will have a chance for a reply. Thank you, Your Honor. Thank you. Good morning. I'm pleased to report my name is Robert Swain. Counsel. I represent the Board of Education of Community Unit School District number 303. I'd like to pick up on this last concern here because it dovetails, I think, right into some of the issues that counsel is completely passing by. This notion that there are monsters under the bed, that we can completely reinvent ourselves, that we can circumvent and kind of undercut all these regulations, goes nowhere because the determination as to whether we must be submitting plans, as to whether or not schools are making AYT, as to whether or not they are in a first or second or third year of academic watch or warning status, are all made by the state board. We don't make those determinations unilaterally. Those determinations are made by the state board. So when we suggest that their complaints here are managed to be taken up by the state board, it's because there's an entire administrative enforcement structure that is set in place to regulate and govern and police these regulations. It's up to ISBE to look at that and determine whether these are still the same schools, continuing in identity, subject to continuing requirements to develop and implement SIS. If you hadn't recombined the schools, what obligation would both Richmond and Davis have had? Assuming that they did not make AYP, which, of course, is an assumption we'd have to make, Richmond would have gone into a fourth year of academic watch. Davis would not have at all because they're making AYP. After a fifth year of academic watch, it is possible that schools might have to be restructured. That's the ultimate kind of penalty under No Child Left Behind and underneath the state paradigm. That's part of the greatest fallacy here, too. Their argument is that we restructured the schools in order to avoid the ultimate penalty of restructuring the schools. Didn't you? We restructured the schools because we thought it would work better for students. If anything, sure, we accelerated what might have happened if Richmond had continued to decline. But you would be required, after the fifth year, you would be required to do more than move the kindergartners to one building, the kindergarten to second grade, and the third grade to fifth grade, I think, to a different building. There was a myriad of things that you would otherwise be required to do that would improve the overall education and presumably test scores. Not a particular list of things as to which we would be specifically required to do. There are a particular list of possibilities. More than simply changing the location of desks in students. I don't know if that's true, Justice. I don't know if that's true, Justice. Again, that's a determination in terms of the restructuring. Your position is that what you did do was sufficient to improve scores. We don't know that yet either because we don't have the data yet. My position is... If we don't know it, how will we ever find out without some sort of an adjudication? We'll find out two ways. Number one, time will tell in terms of showing us what those test scores are at those schools. We don't have data yet because the plan was just implemented last fall. Time will tell how those test scores play out. And then the response to that will be driven by ISBE and by the regulations. But when you say time will tell, you would have already had four years. And then you're entitled to, if this is a new school, another four to five years. That's an entire generation from kindergarten to eighth grade. Oh, sure. Sure. The school board is aware of that. We're a school. And that is of no consequence? No, Justice, not at all. It is so important that we decided we need to make a big change now. We decided that with all of these factors impacting these schools, we had to make a bigger change now. What changes did you make? We not only restructured the school so as to rebalance. Overcrowding is a huge problem. Okay, the plan also, and I'm working off their pleading. I'm not being a judgmental pleader. It's working off their complaint. They're kind enough to attach all this for me. Okay? There are reading support programs. There are teacher mentoring programs. There's an extended school day, adding 40 minutes of instructional time per day equivalent to 20.6 school days over the course of a school year. We have technology initiatives in the science curriculum. Okay? And as we note in the PowerPoint, which they are positive to be a plan, capital P. Okay? There's research showing that the use of technology will actually improve content skills. These are all determinations that are probably made by a local school district. What did you determine, or what do you think the trial court meant when it said they were a coincidence? I think all they meant was this. It is beyond reproach that a school board, a school district, have the authority under black letter school code and under the TSCA case to open and close and reconfigure school attendance centers, school buildings as they see fit. There's actually not a right to attend a neighborhood school. And in this case, where there was a tremendous shift of population in a part of the district, where reconfiguring those attendance areas rebalanced the population, it happened to coincide with the fact that one of those schools was subject to a SIP. Now, I'm not being disingenuous. We understand the school choice was a part of what created that population movement in the first place. But that doesn't mitigate the fact that we had to respond to it and address it somehow. Now, what counsel is really not addressing here, I think, is the most important issue, is that of standing. The plaintiffs here are all parents of students at Davis School. Okay? Davis School was reconfigured from a neighborhood school into a primary attendance center. Okay? They have no basis under the school code. They have no basis under TSCA, it's clear. They can't attack that policy decision on its merits. So what they're asserting is that that decision somehow implicated the school improvement plan at Richmond, the next school over. They say in their appellate briefs that they represent the minority students at Richmond. There's not a single allegation in the complaint to support the idea that they represent students at Richmond. In order to have standing, they must have a discrete injury in fact. The school improvement plan at Richmond was designed to address the test scores at Richmond, was designed to improve the performance of students at Richmond. These are now Davis parents purporting to speak up and sue on behalf of students at Richmond. Where are the Richmond parents? They aren't here. They aren't in suit. They're the ones who would have suffered any kind of injury to this. But let's even look at their theory on the merits, if they had any standing. How about the theory of the writ? The writ of certiorari might apply if this were a quasi-judicial determination being made. This isn't a quasi-judicial determination in the sense that rights of individual parties are being adjudicated or even quasi-adjudicated. It's a quasi-legislative function. The case is made clear. Quasi-legislative decisions don't implicate due process because no one has a vested property right in legislation or in policy. Well, when you say quasi-legislative, are you talking about the black letter law that gives you the power or the authority to close and open schools? Yes. What about the requirement that you're supposed to comply with regulations with no child left behind? What would you call that? What category would that fall into? I would call that quasi-legislative. Because it is up to the local school board and up to the local school district to design those interventions for the benefit of the students who are at the school that is failing. So they're both quasi-legislative? Yes. Okay, now between the general and the specific, which controls the general or the specific? If they conflict, then certainly the specific controls. Say that again? If they conflict, then certainly the specific controls. But the point is this, and it comes to both the point of standing and to the point of an applied right of action. There's no doubt that there's a general authority to open, operate, maintain school buildings, to assign students, and to identify attendance areas. Nothing in the SIPP regulations says you cannot change school boundaries. Nothing in the SIPP regulations says you are not allowed to make other decisions that impact a school subject to a SIPP. That's an incredibly slippery slope. The SIPP regulations say, once you have reached that third year of academic watch, we've now got to come up with some concrete plan, okay, that you're going to try to follow to improve those test scores. It does not say, the regulations in the statute do not say, everything you do now must be written into this plan, and by extension, subject to this heightened vetting process. Subject to this drawn-out process of scientific research, of outside input, of parental review. The regulations absolutely do not say that. If that's true, what's the purpose of the SIPP, then? The purpose of the SIPP is twofold. One, is to make sure that once we've reached the third year of academic watch, we actually are making concrete efforts, identifiable, that we can point to and say, here's what we're going to try to do to improve test scores. And the second, coming back to the point of the administrative scheme, is that it's essentially a monitoring function. We submit the SIPP to ISB, ISB monitors whether we are implementing it properly, okay, and the statute and the regs say a couple things. Number one, they don't actually say that we're required to implement it as written. It says that if we fail to make reasonable efforts to implement it, in the statute, that our funding might be jeopardized. That's a very significant difference. And again, it points to the fact that they are trying to bootstrap Hemel Mulville into a mountain. Now, if they had joined ISB at this point, would you submit that the suit is premature? Say they had standing and they sued the correct party, would you submit based upon the steps you have to take that the suit is premature? Most likely, it might depend upon the allegations they make against ISB. I would think in order to bring ISB into the suit, they would have to essentially allege that ISB was not carrying out its administrative functions properly. It kind of reminds me of Gomer Pyle in Andy Griffith's show where he would run around chasing Barney scenes. Citizen duress, citizen duress. You know, if the ISB is a police officer and he's not doing his job, that doesn't prevent a citizen from, you know, pulling a Gomer. Of course, so long as that's a citizen who actually has standing with an interest in the controversy. These are parents from the next school over looking to interfere with a plan to help the minority population in Richmond. I had some math in my past, and when you say improving scores, there's a difference between improving scores where you take F students and you mix them with A students and you end up getting a C score. Sure. You're not really improving scores. Certainly. Because the F students, if they're still getting Fs, are still doing poorly, and the A students, if they're getting As, aren't getting A pluses. So when you say improving scores, that's kind of a euphemism for I don't really care too much about the scores because scores, in the sense of being pure statistics, don't prove anything. Of course. When you talk about moving these children around or students around to improve the scores, to me that inherently means that in the process of moving them around, the students that have poor grades get better grades, and the students that supposedly get great grades either get great grades again or get better grades. So I haven't heard you say anywhere that in the process of changing the mix of the schools in their different locales that you've actually improved scores so much as you've improved the average of one school and possibly lowered the average of the other school. I understand the concern. Let me respond on two points, if I may. Number one, when it comes to ISAT scores, when it comes to measuring AYP, ASB does not look at the average. By throwing some A students into an F classroom, we don't raise the average to a C. That's not how ASB calculates it. Students take the ISAT exams, each of them individually. And each of them individually is a judge as to whether they have met or exceeded the standards they're expected to meet at that grade level. Now, when ASB comes back in and they accumulate all of those scores by individual students, we are judged by the percentage of students who meet or exceed. The F students, if they remain F students, will still fail that score. The A students will still meet or exceed. It's not a question of bringing an average into play. We still have to bring up the failing students to improve our scores. Absolutely true. My second point is this. It's only too early to know how this works because this is only the first year that we've implemented this plan. We don't have actual data yet. And in the context of which we're jumping on the pleadings, sure. It's not framed within the four corners of the pleadings. But what we will see as we go forward is how those AYP scores come out. ASB, who's responsible for enforcing NCLB, will come in and make a determination as to whether the schools—I mean the AYP—as to whether they should be placed on academic watch or not. Whether or not these are new schools, okay, subject to, say, a clean slate or to a fourth year, which is, again, not a fact set out in the motion for judgment on the pleadings. So perfectly consistent with the plaintiff in this play. That is, we will come in and say, nice try, folks. We don't think that you guys are really doing this right. We're still going to consider Richmond School to be Richmond School, and you're now in year four. Perfectly consistent with the pleadings. That's not anything that's been foreclosed because we don't make those determinations unilaterally. Did the number of students not passing—from the total number of students not passing in both schools, did that number decrease regardless of where they were relocated to? We don't have those results yet, Judge, because those tests are administered in the spring. We'll have those in the fall. I see. But that's my point, is that this is not just remixed classrooms. The tests that were administered this spring, you don't have the results? No, we do not. They're certainly not in the context of the pleadings. They're graded through as is. Okay. Thank you for your time. Thank you very much. Counsel, do you wish to reply? I do. Thank you, Your Honor. Thank you. Towards the end, Madam Justice, I heard the Rebs say nothing in the SIP precludes the district from combining the schools. When you look at their brief, they say this is not a SIP. It's a future education plan. It has nothing to do with a SIP. Is it a SIP or isn't it a SIP? I don't know. And I suggested to the court that I don't think the trial court can make that determination without some type of evidence. I also heard Mr. Swain say that both regulations would be quasi-legislative. If that was the case, I'm a little confused about where ISBE would come in, but that's just me. I don't know how the court feels about that. It seems to be a logical disconnect. How is it a logical disconnect? Aren't they regulated by the state and by legislature? How is it a disconnect? The district is regulated by the state. I don't know to what extent. I do know that if regulation by the state is contingent upon whether or not D-303 filed the law in this case, that we're in serious trouble. Because the conclusion is there, one day after the fact that we raised it. But there's no methodology. There's no reasoning. And quite frankly, Your Honor, the educational community in the state is somewhat of a stand-alone group. They all know each other. Very few people know school law, except for these school lawyers. The administrators are all part of the same group. They go to the same conferences. If, in fact, this methodology is allowed, because as far as I can tell, this is a case of first impression. If, in fact, this methodology is allowed, then it's going to be put into place. And the word of the conference is going to be, you know, not out loud, but in the back room, hey, you want to get around this regulation, combine the schools. You're good to go. And that's interesting because, you know, I think, Your Honor, I think you asked Mr. Swain, what else did the district do with regard to this future educational program to address the issue that the failing AYP scores raised? And he said, well, you know, we brought in iPads. We did reading support programs. We had an extended school day. We did a science curriculum. And he said one other thing, which I could not write down. But, Your Honor, all of these things can be implemented at the same school. There's no reason to change schools to implement this program. The only reason to change schools is to create two new schools so that the regulations no longer apply. Well, they apply. The regulations are no longer being violated. Well, Your Honor, they don't apply for two years under the regulations. So you have an additional two free years, and then you can be in violation for another four years. You're saying that for two years, when they create a new school, they're not tested? They are tested, but it's kind of a free pass. I believe that's Section 183. So, all of these things that were done on this quote-unquote future educational plan certainly could have been done without changing schools. The only difference is that by virtue of combining schools, calling them different names, is that we no longer have to comply with the reqs. And in that context, I think that for the trial court to say, you know, there's nothing at issue here, the pleadings give us everything, there's no reason for any discovery to find out any of these facts, I think that was erroneously premature, and I would ask this court to reverse that for future proceedings. Thank you. All right, thank you very much. We are adjourned.